**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**ADAM RANEY,**

**Plaintiff,**

**v.** **Case No. 24-CV-487**

**LOGAN GOEHL, et al.,**

**Defendants.**

---

**DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Adam Raney, who is incarcerated and representing himself, sues the defendants under 42 U.S.C. § 1983 for allegedly failing to provide him adequate medical care in violation of the Eighth Amendment. The parties filed cross-motions for summary judgment, which are fully briefed and ready for a decision. (Docket # 38, Docket # 46.) For the reasons stated below, the defendants' motion for summary judgment is granted and Raney's amended motion for summary judgment is denied.

## FACTS

At all times relevant, Raney was incarcerated at the Waupun Correctional Institution. (Docket # 48, ¶ 1.) Defendants Maria Gomez-Sena, Nicholas Wodak, and Logan Goehl were correctional officers at Waupun. (*Id.*, ¶¶ 2,4.) Defendant Megan Leberak was employed at Waupun as a Nurse Clinician-2 and worked on weekends. (*Id.* at 5.)

For the purposes of summary judgment, the facts are largely undisputed. On March 25, 2023, Raney was housed in the Restrictive Housing Unit ("RHU") at Waupun. (Docket

# 39 at 1.) At approximately 10:30 a.m., "Raney began feeling strange; he felt dizzy and had a pressure pain in his chest." (*Id.*) The pain continued to increase and at 11:12 a.m., he spoke to Gomez-Sena, who came to his cell. (*Id.*) He told her he had chest pains and asked to see the nurse right away. (*Id.*) Gomez-Sena told Raney she would call the nurse. (*Id.*) A nurse did not come to see Raney. (*Id.*)

At approximately 11:56 a.m., Raney saw Gomez-Sena again as she was doing rounds. (*Id.* at 2.) Raney told her his pain was worse, and in response, Gomez-Sena asked if the nurse had talked to Raney yet. (*Id.*) When Raney said no, Gomez-Sena told him she would remind the nurse. (*Id.*) The nurse never came to Raney's cell, and Raney did not see Gomez-Sena on rounds again. (*Id.*) Raney asserts that Gomez-Sena purposely failed to do her 30-minute safety check rounds and "falsified her rounds logbook to make it look like she did do her rounds." (*Id.*)

When neither Gomez-Sena nor a nurse came to Raney's cell, at 12:46 p.m., he pressed his cell's emergency call button three times in a minute. (*Id.* at 3.) Within that minute Goehl responded, and Raney told him that he believed he was having a heart attack. (*Id.*) Goehl stated that he would inform the nurse. (*Id.*) When Raney had not heard from the nurse, he again pushed the emergency call button at 1:32 p.m. Goehl answered and told Raney, "he would get help." (*Id.*) Raney did not believe Goehl, so he pressed the emergency call button four more times, and Goehl did not respond. (*Id.*)

Shortly after, Raney vomited on the floor. (*Id.* at 4.) As he was attempting to clean up the mess, "he lost consciousness and fell, striking his head on a concrete surface." (*Id.*) It is unclear from the record, but within the hour, Raney gained consciousness. (*Id.*) At 2:39 p.m., he pushed the emergency call button, and Wodak responded. (*Id.*) He explained his

symptoms to Wodak, who said he would get help. (*Id.*) Raney "was unconvinced and pressed the [emergency call button] 10 more times over the next 40 minutes." (*Id.*) Wodak did not respond. (*Id.*)

At 2:46 p.m., Wodak made an entry into the emergency call logbook stating Raney "passed out, chest hurts," and indicating that he notified his supervisor, Sgt. Leopold. (*Id.*)

At 3:25 p.m., Officer Hollfelder came to Raney's cell, and Raney told him his symptoms and that nursing was refusing to respond. (*Id.*at 5.) Hollfelder escorted Raney to the nurse on duty in RHU, Leberak. (*Id.*) When they arrived, Raney asserts that Leberak told them, "she was nearing the end of a 12 hour shift and she was the only nurse on duty in restrictive housing." (*Id.*) As a result, Raney states she rushed through his examination. (*Id.*) She told Raney that "it wasn't possible for Raney to have a had a heart attack, that he wouldn't be able to stand or walk." (*Id.*) She asked Raney about his head injury and told him she would bring him an ice pack. (*Id.*) She also recommended that he rest and stay hydrated. (*Id.*) Raney states she took his blood pressure but did not write down the results. (*Id.*) Raney noticed that his blood pressure was low, and he asked Leberak why. (*Id.* at 6.) She responded that it was likely due to anxiety or stress and recommended rest. (*Id.*)

The defendants note that there is no record that Leberak examined Raney on March 25, 2023. (Docket # 48, ¶ 79.) The Health Services Unit ("HSU") did not receive a Health Services Request ("HSR") from Raney until April 3, 2023, wherein he complained about a "headache that won't quit." (*Id.*, ¶ 42.) On April 13, 2023, Raney submitted a HSR stating that he "hit his head last month and I've been having headaches and I feel that my balance is off." (Docket # 53-1 at 467.) He also noted that he vomited twice recently, which had never happened before. (*Id.*)

Nurse Kataryna Krainyk examined Raney on April 14, 2023, at approximately 9:08 a.m. (Docket # 48, ¶ 44.) He complained about balance issues post-head injury. (*Id.*, ¶ 45.) He told Krainyk that on March 25, 2023, he fell and hit his head on the wall. (*Id.*, ¶ 47.) He believed he was unconscious for approximately 30 minutes. (*Id.*) Since then he was having "intermittent balance issues" and having a headache almost daily. (*Id.*) He indicated that "rest, calming exercises, and ibuprofen" helped the headaches. (*Id.*) Krainyk determined that Raney "was alert and orientated and had stable vital signs." (*Id.*, ¶ 46.) He also was not in apparent distress. (*Id.*)

Raney was evaluated again on April 15, 2023, by Leberak, who indicated that Raney "was responsive and had no injury or illness." (*Id.* 48, ¶ 48.) On April 24, 2023, "Raney was diagnosed with chronic headaches," and he was examined again by nurse Andrea Bleecker on May 5, 2023. (*Id.*, ¶¶ 49–50.) At that examination, Raney reported that he was dizzy and had trouble walking as a result. (*Id.*, ¶ 50.) His blood pressure was 120mm/62 mmHg, and when asked to perform balance exercises, he was able to do so without issue. (*Id.*) His vital signs were stable and he did not have any injuries. (*Id.*) He also told Bleecker that "when he went into the hole" in March 2023, he lost his eyeglasses. (*Id.*, ¶ 52.) As of May 5, 2023, Raney still did not have his glasses. (*Id.*)

On May 30, 2023, Dr. Kerry Kuffenkam examined Raney for complaints of headaches and light sensitivity. (*Id.*48, ¶ 55.) She recommended that Raney continue to use ibuprofen to manage the pain. (*Id.*) Raney continued to be regularly seen in the HSU for headaches and light sensitivity through June 2024. (*Id.*, ¶¶ 57–68.) On May 8, 2024, Raney was examined by Dr. English. (*Id.*, ¶ 64.) Raney complained that he was suffering from regular headaches since he fell in March 2023. (*Id.*, ¶ 65.) Dr. English took Raney's blood

pressure and noted that it was elevated. (*Id.*, ¶ 66.) She informed Raney that the elevated blood pressure could be contributing to his headaches. (*Id.*) Dr. English recommended preventative medication that could help with the headaches, which Raney refused. (*Id.*)

On June 5, 2024, Raney again met with Dr. English who diagnosed him with hypertension. (*Id.*, ¶ 68.) During this appointment, Raney stated "he did have headaches occasionally, but nothing too bad." (*Id.*) Dr. English "recommended lifestyle changes such as increasing water intake, decreasing stress, and more exercise." (*Id.*, ¶ 69.)

The defendants note that Raney had been complaining of chronic headaches since January 26, 2022, and that he did not start complaining of dizziness or light sensitivity until April 13, 2023. (*Id.* ¶¶ 74–75.) There is nothing in the medical record suggesting that Raney suffered a heart attack or had any sort of heart condition. (*Id.*, ¶¶ 77–78.) The defendants submitted the opinion of Dr. Sukowaty, who stated that someone suffering from a heart attack would likely exhibit more symptoms than headaches and sensitivity to light. (*Id.*, ¶ 119.) She also opined that had the March 25, 2023, fall caused the headaches and light sensitivity, Raney would have been complaining of those issues well before April 3, 2023. (*Id.*, ¶ 123.) Raney states that he felt "weak and sick for almost a week" after the March 25 fall. (Docket # 39 at 6.) He stated that it was not until six days after the fall that "he felt well enough to fill out a complaint form." (*Id.*)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the

applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Raney claims that the defendants violated his Eighth Amendment rights when they failed to provide him medical care on March 25, 2023. A prison official violates the Eighth Amendment where he is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "A

medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The condition does not need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

A plaintiff must allege "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). The plaintiff also "must show more than mere evidence of malpractice." *Id*. The plaintiff must show that the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment." *Stallings v. Liping Zhang*, 607 Fed. Appx. 591, 593 (7th Cir. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)).

Additionally, for a § 1983 claim to survive summary judgment, a plaintiff "must establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages." *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) (quoting *Elyea*, 631 F.3d at 864) (emphasis in original).

When taking the facts in a light most favorable to Raney, he cannot establish that his constitutional rights were violated. Raney provides no evidence that he suffered from any cardiac event. At most, he speculates that he perhaps was having a heart attack, which is insufficient to survive summary judgment. *See Herzog v. Graphic Packing Int'l, Inc.*, 742 F.3d

802, 806 (7th Cir. 2014) (stating that a party's "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion").

While Raney establishes that he hit his head on March 25, 2023, he fails to show that this constitutes an objectively serious medical condition or that he suffered an injury as a result. According to Raney, he received medical care within two hours of hitting his head. (Docket # 39 at 4–5.) Leberak examined Raney's head and determined that it was a minor injury that required ice and ibuprofen. Raney provides no evidence that he sustained a more serious injury, such as a concussion. Raney argues that Leberak's examination was substandard and rushed. However, while "[t]he 'receipt of some medical care does not automatically defeat a claim of deliberate indifference,'" a plaintiff must demonstrate that he was administered "'blatantly inappropriate' medical treatment." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (quoting *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007)). Courts "will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the [medical professional] actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409. At most, Raney establishes that he was unhappy with the examination; he does not show that Leberak's assessment that his head injury was not serious was blatantly inappropriate. Even if Raney had suffered a concussion and Leberak missed it, at most, that would be medical malpractice, which is insufficient to establish a constitutional violation. *See Petties,* 836 F.3d at 728.

Nor does Raney show that the two-hour delay between when he hit his head and saw Leberak caused his condition to worsen or caused him to suffer pain that would have been

readily treatable had he received medical care earlier. *See Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (stating that a delay in treatment may "constitute deliberate indifference if such delay exacerbated the injury or unnecessarily prolonged an inmate's pain") (internal quotation and citation omitted). Further, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1034 (7th Cir. 2019) (quoting *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (emphasis in original). Raney presents no evidence that his head injury (or any other symptom) worsened between those two hours. While he did suffer from a slightly prolonged headache, he offers no evidence that the headache was anything out of the ordinary.

Raney states that after the events of March 25, 2023, he "suffers from periodic pains in his chest that are frightening, although they're [*sic*] brief and only a 4-5 pain level . . . and may be the result of tissue damage that he suffered on that day. He continues to have intense, sometimes debilitating headaches that he did not have prior to his heart attack and head injury." (Docket # 39 at 6–7.) Raney's assertions, however, are unsupported by medical records, a professional medical opinion, or an expert opinion. Again, this statement is mere speculation, which, as stated above, is insufficient to defeat summary judgment.

Raney's medical records from April 3, 2023, through June 5, 2024, show he was experiencing chronic headaches, but the medical records also indicate that he suffered from headaches starting in January 2022. They also indicate that he had light sensitivity and blood pressure issues. However, there is no evidence that these conditions were the result of lack of medical care on March 25, 2023. In short, there is no evidence that symptoms Raney

suffered resulted in any immediate objectively serious medical condition and/or caused injuries that were exacerbated by the delay in medical treatment. Summary judgment is granted in favor of the defendants.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The defendants also argued that they are entitled to qualified immunity and that Raney is not entitled to damages because he did not sustain a physical injury. Because the court found in the defendants' favor on the merits of Raney's claims, these arguments need not be addressed. As there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Docket # 46) is **GRANTED**.

**IT IS FURTHER ORDERED** that Raney's amended motion for summary judgment (Docket # 38) is **DENIED**.

**IT IS FURTHER ORDERED** that the case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 6th day of August, 2026.

BY THE COURT:

Nancy Joseph

NANCY JOSEPH
United States Magistrate Judge